Filed 11/27/24  P. v. Valerio CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B327861 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA454331) |
| v. | |
| RAMIRO ALBERTO VALERIO, | |
| Defendant and Appellant. | |

---

APPEAL from a judgment of the Superior Court of Los Angeles County.  Curtis B. Rappe, Judge.  Affirmed.

Janyce Keiko Imata Blair, Under Appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan S. Pithey, Assistant Attorney General, Michael C. Keller and Yun K. Lee, Deputy Attorneys General, for Plaintiff and Respondent.

---

**INTRODUCTION**

A jury convicted defendant Ramiro Alberto Valerio of 12 counts of first degree murder, and it found true multiple-

murder and felony-murder special-circumstance allegations as to each count.  The court sentenced Valerio to 12 consecutive terms of life in prison without the possibility of parole.  On appeal, Valerio contends:  (1) insufficient evidence supports his murder convictions and the felony-murder special-circumstance allegations because the People failed to prove that he was a major participant who acted with reckless indifference to human life during the underlying arson that resulted in the victims' deaths; and (2) the court erred when it allowed one of the prosecution's expert witnesses to relay case-specific hearsay.  We reject each of Valerio's contentions and affirm.

## FACTUAL BACKGROUND

### 1.    Prosecution evidence

#### 1.1.   The arson

In the early 1990's, Valerio was a member of Colombia Lil Cycos, known as CLCS, a clique of the 18th Street gang.  CLCS's main source of income at the time was drug sales.

Valerio and Juan Manuel Romero Lopez, known as "Termite,"[1] were two of CLCS's shot callers.  Valerio was known as the "big boss," and Termite was known as the "enforcer." Valerio gave orders to other members of the clique, and Termite was his "second in command."  CLCS's shot callers decided how to respond to the clique's problems with rival gangs, law enforcement, and local residents.  Valerio answered to Francisco Martinez, also known as "Puppet," a member of the Mexican Mafia.

---

[1]     To avoid confusion with other individuals in this case who share the same last name, we hereafter refer to Juan Manuel Romero Lopez as "Termite."

2

CLCS controlled drug sales around an apartment building at 330 South Burlington Avenue (Burlington Apartments), which was in the clique's territory. CLCS's members and local drug dealers often used the building to evade law enforcement. Valerio and Termite were responsible for managing the drug sales around the Burlington Apartments, including collecting payments from local dealers and enforcing CLCS's control over the territory. Valerio and Termite regularly hung out around the building, and Termite supplied drugs to dealers in the neighborhood.

In early 1993, drug sales around the Burlington Apartments were thriving because the building's manager was paid to provide dealers and gang members access to the building when law enforcement entered the neighborhood. Around February 1993, a new manager began supervising the building. The new manager changed the building's locks and prohibited local drug dealers and gang members from accessing the building, resulting in a decline in drug sales in the neighborhood.

Johanna Mirna Lopez managed a drug-dealing operation around the Burlington Apartments. She often hung out with Valerio and Termite, who allowed her to sell drugs in the neighborhood.

Around February 1993, Lopez complained to Valerio and Termite about the Burlington Apartments' new manager, claiming the manager was causing her drug sales to decline. Janet Gonzalez, a member of the Hoover Locos clique of the 18th Street Gang, was present when Valerio suggested to Termite that they "do a little fire, or a fire to scare" the manager. On another occasion, Gonzalez heard Valerio tell Termite and another gang member that the manager was affecting him "money-wise," and

3

Valerio again suggested that they start "a little fire" at the Burlington Apartments "just to scare" the manager.

On May 2, 1993, Lopez was hanging out with Valerio and Termite when she heard them discussing how to handle the Burlington Apartments' new manager. Valerio stated that he wanted Termite to "fix the problem with the street." When Termite responded that he will "fix it," Valerio said, "Don't worry, this son of a bitch mother, I will put fire to him." Termite told Valerio to bring him "lighter fluid" or "gas."

The next day, May 3, 1993, Lopez saw Valerio hand Termite a black plastic bag that contained "what [Termite] requested the day before." One of the Burlington Apartments residents saw Valerio and Termite standing outside the building. Termite then entered the building while Valerio stood near the entrance.

About 15 minutes later, the same resident saw Termite leave the building. The resident noticed that the building was on fire and that people inside were screaming. 12 people who were inside the building when the fire started—including nine children and two pregnant women—died from smoke inhalation or injuries related to smoke inhalation.

Around the time of the fire, Salvador Granados, another member of the Hoover Locos clique, was inside Valerio's apartment while Valerio, Termite, and several other CLCS members were hanging out near the Burlington Apartments. Granados later saw Valerio, Termite, and another CLCS member enter the apartment. Valerio and the other CLCS member each carried a black trash bag. One of the bags contained a watering can, and both bags smelled like "barbecue liquid." Valerio's face was "red," and he looked like he was in a "panic." Termite

appeared upset and said, "We fucked up." The other CLCS member was "red" and "sweating." As Granados left Valerio's apartment, police and firefighters were responding to the neighborhood.

### 1.2. The investigation

An arson investigator with the Los Angeles Fire Department concluded that the Burlington Apartments fire was intentional. The fire originated from two mattresses and other furniture placed in a second-floor hallway. Ronson lighter fluid was used to ignite the furniture.

Law enforcement interviewed Lopez on several occasions throughout the decades after the fire. In 2000, while she was serving a federal sentence, Lopez told police that she knew nothing about the fire. In 2010, over the course of several interviews with law enforcement, Lopez recounted various events leading up to the fire at the Burlington Apartments, including conversations during which Valerio and Termite promised to take care of the building's manager by starting a fire.

In 2020, Lopez agreed to be interviewed by the prosecutors. During that interview, Lopez initially denied that she told law enforcement that Valerio and Termite ever discussed starting a fire to deal with the manager of the Burlington Apartments. Lopez also denied telling law enforcement that she saw Valerio hand Termite a bag containing a "lighter" before the fire at the apartments was started.

When the prosecutors confronted Lopez with a recording of one of her previous interviews with law enforcement, she acknowledged that, the day before the fire, Termite stated he was going to "light a fire" at the Burlington Apartments to retaliate against the building's manager. Termite asked Valerio to bring

5

him everything he needed to set the building on fire.  On the day of the fire, Valerio handed Termite a black plastic bag.  Valerio then left, and Termite said that he was going to burn the Burlington Apartments.

At trial, Lopez testified that after her interview with the prosecutors, she was offered a leniency agreement, which she accepted.  Lopez told the jury that she pled guilty to two counts of voluntary manslaughter and was sentenced to 22 years in prison.

**2.     Defense evidence**

Valerio testified at trial.  He grew up on Burlington Avenue and joined CLCS in 1989, when he was 15 years old.  Valerio was one of CLCS's shot callers.  Valerio answered directly to Martinez and had to obtain his approval before making decisions for the clique.

Valerio denied ordering the fire at the Burlington Apartments.  He was not present at any CLCS meetings where a plan to start the fire was discussed.  He did not believe the building's manager caused drug sales in the neighborhood to decline.  Valerio claimed that Lopez never complained to him about the building's manager.

On the day of the fire, Valerio was hanging out with his girlfriend and other CLCS members at a restaurant when he saw fire trucks and ambulances driving toward the Burlington Apartments.  When they returned to the neighborhood, the Burlington Apartments were already on fire.

## PROCEDURAL BACKGROUND

The People charged Valerio, Lopez, and a third defendant with, among other crimes, 12 counts of murder (Pen. Code,[2] § 187, subd. (a)). As to each count, the People alleged a felony-murder special circumstance—i.e., that the underlying killings were committed during the commission of arson (§ 190.2, subd. (a)(17)(H)). The People also alleged as to each count a multiple-murder special circumstance (§ 190.2, subd. (a)(3)) and a gang enhancement (§ 186.22, subd. (b)(2)). Lopez and the third defendant entered plea agreements before trial.

A jury found Valerio guilty of 12 counts of first degree murder and, as to each count, found true the felony-murder and multiple-murder special-circumstance allegations. The court sentenced Valerio to 12 consecutive terms of life without the possibility of parole.

Valerio appeals.

## DISCUSSION

### 1. Felony murder findings

Valerio contends insufficient evidence supports his murder convictions and the true findings on the accompanying felony-murder special-circumstance allegations because the People failed to prove that he was a major participant in the underlying arson who acted with reckless indifference to human life. We disagree.

#### 1.1. Applicable law and standard of review

Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437) amended the definition of felony murder by incorporating

---

[2] All further undesignated statutory references are to the Penal Code.

7

section 190.2, subdivision (d)'s requirements for proving a felony-murder special-circumstance allegation. (*People v. Strong* (2022) 13 Cal.5th 698, 708.) Now, to support a first degree murder conviction under a felony-murder theory and a true finding for a felony-murder special-circumstance allegation, the People must prove that the killing was committed in the perpetration of, or during an attempt to perpetrate, one of several enumerated felonies, including arson, and that the defendant either: (1) "was the actual killer"; (2) "was not the actual killer, but, with the intent to kill," aided and abetted the killer in the commission of the murder; or (3) "was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2." (§ 189, subds. (a) & (e); § 190.2, subds. (a)(17), (d).) Here, the court instructed the jury on only the third option—i.e., that Valerio was a major participant in the underlying arson who acted with reckless indifference to human life.

In *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*), the California Supreme Court clarified what it means for a defendant to be a major participant in the underlying felony who acts with reckless indifference to human life. (*Banks*, at p. 803 [discussing major participant factors]; *Clark*, at pp. 618–623 [discussing reckless indifference factors].) The Supreme Court found guidance in the United States Supreme Court's decisions in *Enmund v. Florida* (1982) 458 U.S. 782 and *Tison v. Arizona* (1987) 481 U.S. 137, which "place[d] conduct on a spectrum, with felony-murder participants eligible for death only when their involvement is substantial and they demonstrate a reckless indifference to the grave risk of death created by their actions." (*Banks*, at p. 793;

8

see also *Clark*, at p. 616 [acknowledging *Tison* as "the source of the language of section 190.2, subdivision (d)"].)

In *Banks*, the court identified the following factors for determining whether a defendant was a major participant in the underlying felony: (1) the role the defendant played in planning the target crime that led to the victim's death; (2) the role the defendant played in supplying or using lethal weapons; (3) the defendant's awareness of the particular dangers posed by the nature of the crime, the weapons used, or the past experience or conduct of the other participants; (4) whether the defendant was present at the scene of the killing and, if so, whether he was in a position to facilitate or prevent the death; (5) whether the defendant's actions or inactions at the scene of the killing played a particular role in the victim's death; and (6) the defendant's conduct after lethal force was used. (*Banks*, *supra*, 61 Cal.4th at p. 803.) None of these factors is necessary, nor is any one necessarily sufficient, to establish the defendant was a major participant. (*Banks*, at p. 803.)

In *Clark,* the court explained that reckless indifference "encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions." (*Clark*, *supra*, 63 Cal.4th at p. 617.) Reckless indifference includes a subjective and an objective element. (*In re Scoggins* (2020) 9 Cal.5th 667, 677 (*Scoggins*).) For the subjective element, " '[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed,' and he or she must consciously disregard 'the significant risk of death his or her actions create.' " (*Ibid*.) To satisfy the objective element, " ' "[t]he risk [of death] must be of such a nature and

9

degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation." ' " (*Ibid*.)

*Clark* identified the following factors to be considered in determining whether a defendant acted with reckless indifference to human life:  (1) the defendant's awareness that a gun or other weapon would be used during the target offense; (2) the defendant's presence at the crime and whether he had an opportunity to prevent the crime or aid the victim; (3) the duration of the felony, including how long the defendant and the victim interacted before the killing; and (4) the defendant's apparent efforts to reduce the risk of violence during the commission of the target offense.  (*Clark*, *supra*, 63 Cal.4th at pp. 618–623; *Scoggins*, *supra*, 9 Cal.5th at p. 677.)

The reckless indifference factors " 'significantly overlap' " with the major participant factors, " 'for the greater the defendant's participation in the felony murder, the more likely that he acted with reckless indifference to human life.' " (*Clark*, *supra*, 63 Cal.4th at p. 615.)  Like the major participant factors, none of the reckless indifference factors is necessary, nor is any one of them necessarily sufficient, to establish the defendant acted with reckless indifference.  (*Scoggins*, *supra*, 9 Cal.5th at p. 677.)  In weighing these factors, courts must consider the totality of the circumstances.  (*Ibid*.)

When a defendant challenges the sufficiency of the evidence to support his conviction, we review the entire record in the light most favorable to the judgment to determine whether any rational trier of fact could have found the evidence proved

10

the elements of the crime beyond a reasonable doubt. (*People v. Manibusan* (2013) 58 Cal.4th 40, 87.) We draw all reasonable inferences in favor of the judgment. (*Ibid.*) We neither reweigh evidence nor reevaluate the credibility of witnesses. (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.)

If the evidence supports the jury's findings, our opinion that the evidence might also support a contrary finding does not warrant reversal of the conviction. (*People v. Cravens* (2012) 53 Cal.4th 500, 508.) Before we may set aside the judgment, it must be clear that "upon no hypothesis whatever is there sufficient substantial evidence to support it." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

### 1.2. Substantial evidence supports the jury's finding that Valerio was a major participant in the underlying arson

Applying the factors outlined in *Banks*, substantial evidence supports the jury's finding that Valerio was a major participant in the underlying arson.

The first factor—Valerio's role in planning the arson—weighs heavily in favor of a finding that Valerio was a major participant in the underlying arson. Valerio was one of CLCS's shot callers, and he oversaw drug sales around the Burlington Apartments. As a shot caller, Valerio was responsible for addressing the clique's problems with local residents and other gangs. A few months before the fire, Lopez complained to Valerio that the new manager at the Burlington Apartments was causing drug sales to decline in the area. Valerio proposed to Termite that they "do a little fire" to scare the manager. Valerio later made the same suggestion—to start a fire at the apartments— while complaining about the manager to Termite and another

11

gang member. Importantly, the day before the fire, Lopez heard Valerio tell Termite not to worry about the manager because he (Valerio) would "put fire to him." There was, therefore, ample evidence that Valerio played a significant role in planning the arson, including proposing the idea to set the Burlington Apartments on fire.

The second factor—Valerio's role in supplying or using lethal weapons—also strongly supports the jury's major participant finding. The arson investigator testified that the Burlington Apartments fire was started with lighter fluid. According to Lopez, Termite asked Valerio to bring him "lighter fluid" or "gas" the day before the fire. The day of the fire, Lopez saw Valerio hand Termite a black plastic bag that contained "what [Termite] requested the day before"—i.e., lighter fluid or gas. One of the residents then saw Termite enter the Burlington Apartments while Valerio stood near the entrance. About 15 minutes later, the same resident saw Termite leave the building, and she noticed that the building was on fire. Granados then saw Valerio and another CLCS member enter Valerio's apartment carrying black plastic bags, both of which smelled like "barbecue liquid." Based on this evidence, a jury reasonably could infer that Valerio supplied the lethal weapon—i.e., the lighter fluid used to start the fire at the Burlington Apartments.

The third factor—Valerio's awareness of the particular dangers posed by the crime—also supports a finding that Valerio was a major participant. Valerio and Termite planned to set fire to an occupied apartment building. Valerio regularly hung out in front of the Burlington Apartments and would have been aware that residents were often present in the building. The jury reasonably could infer that Valerio should have known that

setting fire to an occupied apartment building would pose a significant risk to the lives of those who were inside the building.

Valerio's presence at the scene of the killings, his role in contributing to the victims' deaths, and his failure to try to prevent the fire or aid the victims also weigh heavily in favor of a major participant finding. Lopez and a local resident saw Valerio near the building around the time the fire was started. Lopez saw Valerio hand Termite a bag before Termite entered the building, and the resident saw Valerio standing outside the building while Termite went inside. From this evidence, the jury could infer that Valerio played a significant role in the victims' deaths by supplying the lighter fluid used to ignite the fire. In addition, the jury could find that by standing outside the building while Termite started the fire, Valerio could, but failed to, warn residents that the building would be set on fire or help residents escape the building once the fire began.

Based on the foregoing, there was ample evidence from which the jury could find that Valerio was a major participant in the underlying arson.

### 1.3. Substantial evidence supports the jury's finding that Valerio acted with reckless indifference to human life

Substantial evidence also supports the jury's finding that Valerio acted with reckless indifference to human life under the factors outlined in *Clark*. Because many of the major participant factors that we just discussed also support a finding that Valerio acted with reckless indifference to human life, we condense our analysis of the reckless indifference factors. (See *Clark, supra*, 63 Cal.4th at p. 615 [because the two sets of factors " 'significantly overlap,' " where the defendant's participation in

13

the underlying felony is substantial, " 'the more likely that he acted with reckless indifference to human life' "].)

The first factor—Valerio's awareness that a lethal weapon would be used in the arson—strongly supports a finding that Valerio acted with reckless indifference. As we just discussed, the People presented evidence that Valerio both conceived of the plan to set fire to the Burlington Apartments and provided the lighter fluid to start the fire. The jury, therefore, could reasonably find that Valerio was aware a lethal weapon would be used during the target offense.

Valerio's presence at the scene of the crime, the duration of the crime, and his failure to prevent the crime or aid any of the victims also strongly support the jury's reckless indifference finding. As we explained earlier, witnesses saw Valerio hand Termite a bag before Termite entered the Burlington Apartments. Valerio stood outside the building for about 15 minutes while Termite went inside to start the fire. During that time, Valerio did not attempt to warn any of the residents that the building was going to be set on fire. Nor did Valerio help any of the residents escape once the fire was started.

Finally, there was no evidence that Valerio made any effort to reduce the risk of violence during the arson. Indeed, the evidence shows that Valerio played a significant role in increasing the risk of violence.

In sum, ample evidence supports the jury's finding that Valerio was a major participant in the underlying arson who acted with reckless indifference to human life.

14

### 1.4. Valerio's arguments challenging the sufficiency of the evidence to support the jury's felony-murder findings lack merit

Relying on *People v. Ware* (2022) 14 Cal.5th 151 (*Ware*), Valerio argues we must reverse his murder convictions and vacate the true findings on the felony-murder special-circumstance allegations because the People relied solely on the fact of his gang membership to prove he was a major participant in the underlying arson who acted with reckless indifference to human life. In *Ware*, the California Supreme Court reversed the defendant's conviction for conspiracy to commit murder because it was based only on evidence of his gang membership, access to weapons, and social media posts celebrating violence against rival gangs. (*Id.* at pp. 156, 168.) The Court held that such evidence was insufficient to show the defendant possessed the specific intent to agree to kill and to commit the killings. (*Id.* at pp. 167–168.)

Valerio's reliance on *Ware* is misplaced. Valerio was not charged with conspiracy to commit murder, so the People were not required to prove that he possessed the specific intent to agree to kill or the specific intent to commit any killings in this case. More importantly, unlike the prosecution in *Ware*, the People did not rely primarily on Valerio's gang membership to prove his guilt. Instead, they relied on aspects of Valerio's gang membership, such as his role as a shot caller within the CLCS, to support other evidence that showed he played a direct role in planning and carrying out the underlying arson to prove that he was a major participant in that crime who acted with reckless indifference. For the reasons we discussed above, there was more than ample evidence of Valerio's conduct surrounding the

15

underlying arson to support the jury's finding that he was a major participant in that crime who acted with reckless indifference to human life. In other words, the jury's felony murder findings do not punish Valerio merely because he was a member of a gang. (See *Ware*, *supra*, 14 Cal.5th at pp. 168–169.)

Valerio next contends that we must disregard Lopez's statements concerning Valerio's role in planning and participating in the underlying arson because she was an accomplice to the crimes and her statements were not sufficiently corroborated. This argument lacks merit.

A jury may not consider accomplice testimony unless it is supported by corroborating evidence. (§ 1111.) The law, however, "requires only slight corroboration, and the evidence need not corroborate the [accomplice] testimony in every particular." (*People v. Gurule* (2002) 28 Cal.4th 557, 628.) Corroborating evidence is sufficient so long as it tends to connect the defendant to the crime and relates to some act or fact that is an element of the crime. (*People v. Williams* (1997) 16 Cal.4th 635, 680–681.)

Consistent with these principles, the court instructed the jury that if it found the crime of first or second degree murder was committed, then Lopez was an accomplice to that crime. The court further instructed the jury that it could not rely solely on Lopez's statements to convict Valerio, and that it could use her statements to support a finding of guilt only if: (1) they were supported by other credible evidence; (2) the supporting evidence was independent of Lopez's testimony; and (3) the supporting evidence tended to connect Valerio to the commission of the crimes.

These requirements were met here.  As for Lopez's statements that Valerio proposed setting the Burlington Apartments on fire, Gonzalez overheard Valerio's conversation with Termite, when he first made that proposition.  Gonzalez heard Valerio make a similar proposition to Termite and another gang member on a separate occasion.  Although Lopez was the only person to testify that Valerio handed Termite a black plastic bag containing lighter fluid before the fire was started, that testimony was corroborated by other witnesses.  Specifically, one of the Burling Apartments residents watched Termite enter the building after interacting with Valerio, shortly after which she noticed the building was on fire.  In addition, Granados testified that he saw Valerio carrying a black plastic bag that smelled like lighter fluid shortly after the fire began.

Valerio also argues we should disregard many of the witnesses' statements connecting him to the underlying crimes because those witnesses either waited many years before reporting Valerio's involvement to authorities or they made out-of-court statements that were inconsistent with their testimony at trial.  Under a substantial evidence review, we are not permitted to second-guess the jury's credibility determinations.  (*Lindberg*, *supra*, 45 Cal.4th at p. 27.)  Here, the jury heard evidence that many of the witnesses waited several years to report Valerio's involvement in the underlying crimes, and they heard some of the witnesses' out-of-court statements that were inconsistent with their in-court testimony.  To the extent the jury relied on those witnesses' statements connecting Valerio to the underlying crimes, we must defer to the jury's decision to do so.  (*Ibid*.)

## 2.    Expert hearsay testimony

Valerio next contends the court violated his Sixth Amendment right to confront witnesses when it permitted the People's arson investigator to relay case-specific hearsay about the process used to review the investigative reports that he generated for this case.  As we explain, Valerio invited any error because his counsel elicited the challenged testimony on cross-examination.  Because Valerio's counsel made a reasonable tactical decision when he elicited that testimony, Valerio cannot show counsel rendered ineffective assistance.  In any event, any error in eliciting the investigator's testimony was harmless.

### 2.1.    Relevant background

During opening statements, Valerio's counsel conceded that the fire at the Burlington Apartments "was an arson."  Counsel asserted, however, that Valerio had nothing to do with the fire.

An arson investigator later testified for the People.  He concluded that the Burlington Apartments fire was intentional.  On cross-examination, Valerio's counsel asked the investigator whether he consulted with other experts and whether the investigative reports that he produced in this case were reviewed by "superiors."  The investigator confirmed that he consulted with other experts.  The investigator also explained that an arson investigator's "files" generally have to undergo two types of review:  a peer review and a technical review.  The investigator confirmed that the reports he produced in this case passed both types of review.

During his closing argument, Valerio's counsel attacked the credibility of one of the People's experts on the Mexican Mafia, calling the witness a "con artist."  Defense counsel then told the jury, "You may have noticed I used the arson expert just to

18

illustrate in my questioning of the arson expert—I don't know if you caught it—but I was just trying to show you what an expert looks like, what an expert's qualification[s] are. [¶] An expert has skill, an expert has training, an expert has experience. An expert consults with other experts. An expert tests his theories. An expert relies on reliable evidence. [¶] [The Mexican Mafia expert] didn't even know that the tapes that he was analyzing for you and the letter that he was analyzing for you were all done with [Valerio] under the supervision of the FBI. He didn't even know it while he is telling you what they all mean and what they show you about [Valerio]."

### 2.2. Valerio invited error by eliciting the challenged testimony

An expert may relate hearsay statements concerning general background information that informs or contributes to his opinion. (*People v. Sanchez* (2016) 63 Cal.4th 665, 676 (*Sanchez*).) The expert may not, however, relate testimonial hearsay statements about case-specific facts. (*Ibid.*) "Case-specific facts are those relating to the particular events and participants alleged to have been involved in the case being tried." (*Ibid.*) If the expert relates testimonial hearsay, "there is a confrontation clause violation unless (1) there is a showing of unavailability and (2) the defendant had a prior opportunity for cross-examination, or forfeited that right by wrongdoing." (*Id.* at p. 686.)

The People argue that Valerio cannot challenge the admission of the arson investigator's testimony because he invited any error. The doctrine of invited error precludes a defendant from arguing on appeal that the court erroneously admitted evidence that the defendant elicited. (*People v.*

*Williams* (2009) 170 Cal.App.4th 587, 620 (*Williams*).) The doctrine of invited error applies to claims that an expert witness relayed case-specific testimonial hearsay in violation of *Sanchez*. (*People v. Bell* (2020) 47 Cal.App.5th 153, 193.)

Here, defense counsel asked the questions that elicited the investigator's testimony that Valerio now challenges on appeal. Valerio has, therefore, waived any challenge to that testimony. (*Williams*, *supra*, 170 Cal.App.4th at p. 620.)

### 2.3. Defense counsel's performance was not deficient

Anticipating the People's invited error argument, Valerio contends his counsel rendered ineffective assistance by eliciting the arson investigator's challenged testimony. We disagree.

The federal and state constitutions entitle a criminal defendant to the effective assistance of counsel. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15; *Strickland v. Washington* (1984) 466 U.S. 668, 686 [the right to counsel entitles a defendant to effective counsel].) That right entitles a defendant to " 'the reasonably competent assistance of an attorney acting as [her] diligent conscientious advocate.' [Citations.]" (*People v. Ledesma* (1987) 43 Cal.3d 171, 215.)

To establish a claim for ineffective assistance of counsel, a defendant must prove by a preponderance of the evidence that: (1) his lawyer's performance was deficient because it fell below an objective standard of reasonableness in all the circumstances; and (2) that absent those errors, a different outcome was reasonably probable. (*People v. Cunningham* (2001) 25 Cal.4th 926, 1003) We defer to counsel's reasonable tactical decisions, and there is a presumption counsel acted within the wide range of reasonable professional assistance. (*People v. Mai* (2013) 57 Cal.4th 986, 1009 (*Mai*).) "On direct appeal, a conviction will

be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation." (*Ibid.*)

As our summary of his closing argument illustrates, Valerio's counsel made a tactical decision to elicit the arson investigator's testimony that the investigative reports he generated in this case underwent peer and technical reviews. That is, Valerio's counsel explained to the jury that he elicited the challenged testimony to undermine credibility of the People's expert on the Mexican Mafia by contrasting the arson investigator's business practices and professional qualifications against the Mexican Mafia expert's alleged lack of qualifications and preparation before testifying in this case. On this record, we cannot say that counsel's decision to elicit the arson investigator's challenged testimony was unreasonable. (*Mai*, *supra*, 57 Cal.4th at p. 1009 [we presume counsel's tactics were reasonable].)

Even if we were to assume counsel's strategy was unreasonable, it did not prejudice Valerio. Testimonial hearsay admitted in violation of the Sixth Amendment's confrontation clause requires reversal unless the People show the error was harmless beyond a reasonable doubt. (*People v. Azcona* (2020) 58 Cal.App.5th 504, 514.)

The challenged testimony addressed whether the arson investigator's reports concluding that the Burling Apartments fire was intentionally set were reviewed and approved by other arson experts. The challenged testimony was, therefore, relevant to establishing the People's theory that the fire was the result of arson. But Valerio conceded that point at trial. As we discussed

21

earlier, Valerio's counsel told the jury during opening statements that the fire "was an arson," while claiming that Valerio had nothing to do with it. Thus, by the time the arson investigator testified about the process for reviewing his investigative reports, Valerio had already conceded the issue to which the challenged testimony was relevant. Valerio, therefore, could not have been prejudiced by the arson investigator's testimony.

**DISPOSITION**

The judgment is affirmed.


VIRAMONTES, J.

WE CONCUR:


STRATTON, P. J.


GRIMES, J.